**EDWARD PETRY & COMPANY, Inc.,**
a corporation, Plaintiff,

v.

**GREATER HUNTINGTON RADIO COR-
PORATION, a corporation,
Defendant.**

Civ. A. No. 1047.

United States District Court
S. D. West Virginia,
Huntington Division.

Aug. 13, 1965.

J. B. Meek, Meek, Scherr & Vinson, Huntington, W. Va., and Ambrose Doskow, and E. A. Gleit, Rosenman, Colin, Kaye, Petschek & Freund, New York City, for plaintiff.

C. F. Bagley, Jr., Campbell, McNeer, Woods, Bagley & Emerson, Huntington, W. Va., for defendant.

CHRISTIE, District Judge:

This is a diversity of citizenship case brought under 28 U.S.C.A. 1332. Its object is to recover damages for breach of contract. Requisite jurisdictional amount is alleged.

The case originally involved a claim by plaintiff, Edward Petry & Company, Inc., hereinafter referred to as "Petry," against Cowles Broadcasting Company and Greater Huntington Radio Corporation, hereinafter referred to as "Cowles" and "Greater Huntington," as parties defendant. A separation was ordered and the claim against Cowles was tried to a jury and resulted in a verdict in favor of Cowles on the 24th day of October, 1962. Later in the day, the claim against Greater Huntington was tried to the late Judge Harry E. Watkins, sitting without a jury, but a decision was never handed down therein due to his sudden death. The Petry claim against Greater Huntington was submitted for decision to Judge Watkins upon the relevant evidence taken in the jury trial of Petry against Cowles and upon certain additional evidence taken before him. The author of this opinion first became acquainted with the case when he considered Petry's motion to set aside the jury verdict in favor of Cowles and to grant a new trial, timely filed with Judge Watkins before his death. Such motion was denied on December 28, 1964, and no appeal being taken therefrom, the verdict and judgment in favor of Cowles became the final adjudication of the matter. Therefore, we are now only concerned with Petry's complaint against Greater Huntington.

The relevant facts are as follows:

In 1955, Greater Huntington was granted a license to operate a television station at Huntington, West Virginia, WHTN–TV. To obtain national advertising for the station, Greater Huntington entered into a written agreement with Petry on July 26, 1955,[1] whereby

1. "AGREEMENT made by and between EDWARD PETRY & COMPANY, INC., a new York corporation, hereinafter designated the "REPRESENTATIVE", and GREATER HUNTINGTON RADIO CORPORATION, a West Virginia corporation, hereinafter designated the "STATION".

WITNESSETH

"1. STATION represents that it is the owner of the television station now called WHTN–TV (Channel 13), located at Huntington, West Virginia. The provisions of this agreement shall apply and are limited to said television station.

"2. STATION hereby appoints REPRESENTATIVE as the sole and exclusive representative and agent for the sale of STATION'S time, programs, program packages and facilities for advertising purposes and which advertising is billed to or paid for by persons, firms and corporations not located within a radius of sixty miles of (Huntington) West Virginia. Such advertising is referred to herein as 'NATIONAL SPOT ADVERTISING', and all contracts (including blanket contracts, purchase or insertion orders and extensions) placed with STATION for the purchase of time, programs, program packages or facilities for NATIONAL SPOT ADVERTISING are referred to herein as 'NATIONAL SPOT ADVERTISING CONTRACTS'. NATIONAL SPOT ADVERTISING shall not, however, include advertising by means of simultaneous network broadcasts or telecasts, kinescope recordings or delayed broadcasts.

"3. REPRESENTATIVE agrees to render to STATION the regular and usual services which REPRESENTATIVE renders to television stations represented by REPRESENTATIVE for the sale of NATIONAL SPOT ADVERTISING, and to give assistance in the collection of STATION'S delinquent accounts on NATIONAL SPOT ADVERTISING CONTRACTS.

"4. REPRESENTATIVE shall receive from STATION a commission of fifteen per cent (15%) on all net amounts collected on all NATIONAL SPOT ADVERTISING CONTRACTS whether said contracts are obtained by REPRESENTATIVE or not.

"5. REPRESENTATIVE shall receive such commission on all NATIONAL SPOT ADVERTISING broadcast or telecast by STATION during the term of this agreement; and, after the termination thereof, on all NATIONAL SPOT ADVERTISING CONTRACTS agreed to during the term hereof.

"6. REPRESENTATIVE cannot and shall not execute any contract which binds or obligates STATION, without receiving written or telegraphic authority from STATION to do so.

"7. STATION agrees that it will not, during the term hereof, engage or use the services of any person, firm or corporation (other than REPRESENTATIVE and regularly employed members of STATION'S staff) in the sale of NATIONAL SPOT ADVERTISING.

"8. REPRESENTATIVE agrees that during the term hereof, it will not represent any other television broadcasting station that is located within a radius of seventy-five (75) miles of the City of Huntington, West Virginia.

"9. STATION shall do all billing, and shall use its best efforts to collect all sums due STATION under all NATIONAL SPOT ADVERTISING CONTRACTS, and STATION shall remit to REPRESENTATIVE on or before the twenty-fifth (25) day of each month all commissions due REPRESENTATIVE hereunder, and accompany each such payment with duplicate invoices rendered to agencies or advertisers together with a detailed statement.

"10. The term of this agreement shall commence on the 1st day of September, 1955 and shall continue until terminated by either party giving to the other notice of termination, by registered mail, at any time during the thirty (30) day period prior to the end of the fourth year, commencing with the beginning of the term hereof, or the end of any successive four-year period thereafter, any such notice to become effective twelve (12) months after the date of the giving of such notice.

"11. The failure of either party to this agreement to insist upon the strict performance of any of the terms and conditions of this agreement shall not be deemed a waiver of any such term or condition, and shall not be deemed a waiver of any subsequent breach or default of the terms and conditions herein contained.

"12. This agreement shall be deemed made, executed and delivered in the State

Petry was made Greater Huntington's exclusive representative for the sale of national spot television advertising. Due to financial difficulties, however, in May of 1956, Greater Huntington sold its television station to Cowles. For our purposes, the pertinent provision of the contract of sale was that Cowles agreed to buy from Greater Huntington all of its assets of every kind, sort and description (except for current assets). A subsequent letter signed by Cowles, dated May 14, 1956, became a part of the written contract of sale. The letter stated that Greater Huntington would assign and that Cowles would assume all of the rights and obligations of Greater Huntington under certain leases and agreements. Significantly, the agreement between Petry and Greater Huntington was not therein listed as one of them. Cowles, however, after purchasing the assets of Greater Huntington, went ahead and accepted and paid for similar services from Petry for a period of 3½ years.

Shortly after August 1, 1956, Greater Huntington paid Petry its commissions on all national spot advertising obtained by it prior to that date. Until the institution of this suit, there was no further communication between Petry and Greater Huntington, nor was there any further sale of spot advertising by Petry to Greater Huntington. In the meantime, Greater Huntington dissolved its corporation and went out of business.

More than three years later, in November of 1959, Cowles notified Petry that, effective January 1, 1960, it would no longer be doing business or need its services. Petry, believing that no proper notice of termination had been given by Cowles in accordance with the terms of

the contract between Petry and Greater Huntington, which it then understood to have been assumed by Cowles, brought this action for breach of contract against both Cowles and Greater Huntington. As previously noted, the jury in the Cowles trial found in effect that Cowles did not acquire, as one of Greater Huntington's assets, the agreement between Petry and Greater Huntington, thus absolving Cowles of any liability.

■■ This left to be disposed of the claim of Petry against Greater Huntington and to place the issue between these parties in proper perspective, we must first look to the status of the contractual obligations existing between them before Greater Huntington sold out to Cowles. So viewed, there can be no doubt that had the transaction with Cowles not taken place, Greater Huntington's obligation to carry out the contract would have continued. This being so, Greater Huntington could not unilaterally assign and transfer to another its side of the contract and thereby relieve itself of its obligations thereunder. Undoubtedly, many who have bound themselves to unwise commitments would like to shed them in this fashion, but the law does not permit it. True it is, there is no prohibitive provision in the contract against transfer or assignment, and that Greater Huntington, without question, had the right to assign and delegate to Cowles the *performance* of those things that were therein incumbent upon it to perform, but it could not by such assignment or delegation escape its legal *duty* to fulfill its contractual undertaking to Petry. Such is settled law. See Crane Ice Cream Company v. Terminal Freez-

of New York at the New York City office of REPRESENTATIVE, pursuant to the laws of the State of New York and shall be construed under the laws of the State of New York.

"13. The invalidity of any of the terms and conditions of this agreement shall not invalidate or affect the remainder of this agreement.

"14. This agreement constitutes the entire agreement between the REPRE-

SENTATIVE and the STATION and there are no understandings or agreements other than herein contained. It is expressly understood that any change or modification of the terms or conditions of this agreement must be made by an instrument in writing, duly executed by an Officer of REPRESENTATIVE and by a duly authorized representative of STATION."

ing Company, (1925) 147 Md. 588, 128 A. 280, 283, 39 A.L.R. 1184, where it is said,

> "[I]t has been uniformly held that a man cannot assign his liabilities under a contract, but one who is bound so as to bear an unescapable liability may delegate the performance of his obligation to another, if the liability be of such a nature that its performance by another will be substantially the same thing as performance by the promisor himself. In such circumstances the performance of the third party is the act of the promisor, who remains liable under the contract and answerable in damages if the performance be not in strict fulfillment of the contract."

To like effect is Atlantic & N. C. R. Co. v. Atlantic & N. C. Co., 147 N.C. 368, 61 S.E. 185, 23 L.R.A.,N.S., 223, where it is said that whether the performance required is a personal one or not, the legal duty to perform is not escaped by an assignment or delegation. Since, therefore, it is impossible for the original obligor to assign away his duty, how can he get rid of it? Only by some one of the recognized methods by which contractual duty is legally discharged. Most of these, including novation, require the assent of the obligee, the party having the right correlative to the duty to be discharged. We find no evidence in the record, indeed we do not understand Greater Huntington to so contend, that it had any commitment from Petry, before or subsequent to the sale, that it (Greater Huntington) would be relieved of its obligations under the contract. To the contrary, Greater Huntington, for defense, relies upon (1) novation, (2) estoppel, (3) waiver, and (4) that it being a requirements contract, it has not been breached. Novation, estoppel and waiver being interrelated, we will consider them first.

Novation is generally defined as a mutual agreement among all parties concerned for discharge of a valid existing obligation by the substitution of a new valid obligation on the part of the debtor or another. Arlington Towers Land Corporation v. McFarland, 203 Va. 387, 124 S.E.2d 212; 66 C.J.S. Novation § 1 (1950). Thus, the essential requisites of a novation are, (a) a previous valid obligation, (b) the agreement of all parties to the new contract, (c) the extinguishment of the old contract, and (d) the validity of the new contract. There can be no novation if any one of these essentials is wanting. 66 C.J.S. Novation § 3 (1950). We think that the July 26, 1955 agreement between Petry and Greater Huntington quite properly meets the first requirement of a previous and valid obligation. As to the second requirement, Greater Huntington contends, and we think correctly so, that acceptance of the terms of a novation ordinarily does not need to be shown by express words to that effect, but the same may be implied from the facts and circumstances attending the transaction and conduct of the parties thereafter. MacQuoid v. West Virginia Newspaper Pub. Co., 105 W.Va. 20, 141 S.E. 398; 66 C.J.S. Novation § 4 (1950). But a novation will not be implied from the mere performance of the contract by the substitute even though the party having notice of the assignment assents thereto and enters into the performance of the contract with the new party. 66 C.J.S. Novation § 18 (1950). However, even if we were to assume here that the facts and circumstances implied an acceptance of the novation by the parties, the novation must fail because it does not meet requirement (d), i. e., a valid new obligation, for it is essential that the obligation be a valid and enforceable one against the new party. 66 C.J.S. Novation § 21 (1950). Cf. Rosier v. McDaniel, 129 W.Va. 401, 40 S.E.2d 832.

But be that as it may, in the trial of Petry against Cowles, Cowles contended that it did not assume the contract in question, and Judge Watkins determined that the evidence presented an issue of fact and, under proper instructions, submitted the question to the

jury, who found in favor of Cowles. On motion for a new trial, the thrust of Petry's argument was that no factual issue was presented for jury consideration, but this was overruled and judgment entered on the verdict. While it is true that there is additional evidence before the Court in the instant case that was not before the jury in the Cowles case, yet an examination of such additional evidence on the question involved reveals no facts materially different from those before the jury, and this Court must accordingly find that it has already been judicially determined that the representation contract was not comprehended by the sale from Greater Huntington to Cowles, and that Cowles, therefore, did not assume it.

 Greater Huntington contends though, that it is not essential to the creation of a novation that Cowles assume the specific agreement which existed between it and Petry. Greater Huntington alleges it is sufficient if Cowles and Petry substituted a new agreement involving the representation by Petry of the television station. The record, however, lends no support to the theory that the parties intended to substitute a new and valid contract, and the intention of the parties in such matters is controlling. 66 C.J.S. Novation § 18 (1950). In fact, the evidence of record as to the intention of the parties in this regard is to the contrary. As stated in the letter from Petry to Cowles in November of 1959,

> "As we understood it, Cowles Broadcasting Company acquired the assets of Greater Huntington Radio Corporation. Among these assets was the station's contract with us, pursuant to which we continued to represent the station and pursuant to which you continued to accept our representation and to make payment to us."

Therefore, believing that the only contract that could be the subject of a novation is the agreement between Petry and Greater Huntington, and it being found to be unenforceable by Petry against Cowles, there was and can be no novation.

 Greater Huntington also contends that Petry's silence for over 3½ years after Cowles purchased the television station and its acceptance of performance of the contract by Cowles should estop Petry from now asserting any claim against it under the contract. We do not agree with this contention. To constitute equitable estoppel, there must exist a false representation or concealment of material facts; it must have been made with knowledge, actual or constructive, of the facts; the party to whom it was made must have been without knowledge or means thereof of the real facts; it must have been made with the intention that it should be acted upon; and the party to whom it was made must have relied or acted upon it to his prejudice. Stuart v. Lake Washington Realty Corporation, 141 W.Va. 627, 92 S.E.2d 891 (1956); Norfolk and Western Railway Company v. Perdue, 40 W.Va. 442, 21 S.E. 755. Furthermore, mere silence will not raise an estoppel; to be effective it must appear that the person to be estopped has full knowledge of all the facts and of his rights, and intended to mislead or at least was willing that the other party might be misled by his attitude. Campbell v. Lynch, 88 W.Va. 209, 106 S.E. 869. Of even greater importance, we think, is the proposition that equitable estoppel cannot be successfully asserted against a person who was ignorant of the facts and the true state of affairs, or who acted under a mistake of fact. Cf. 31 C.J.S. Estoppel § 70 (1964). When Cowles purchased the assets of Greater Huntington, it is quite apparent that Petry thought that Cowles assumed as one of the assets its representation contract with Greater Huntington. This is shown by the previously mentioned letter from Petry to Cowles in November of 1959, and further evidenced by Petry's complaint against Cowles wherein it is stated,

> "Upon the acquisition of said station by defendant Cowles, said de-

fendant assumed all the obligations of defendant Huntington under the aforementioned agreement with plaintiff dated July 26, 1955, and agreed with plaintiff to be bound by said agreement."

There would be no reason for Petry to think otherwise. In fact, neither it, nor Greater Huntington, nor Cowles, knew differently until the verdict and judgment in the case of Petry v. Cowles were rendered. That they all acted under a mutual mistake of fact is thus apparent.

From and after August 1, 1956, Petry performed for Cowles precisely the same services that it had previously performed for Greater Huntington, which were the services described in the contract, and Petry was paid by Cowles for its services performed under said contract at the same rate provided for in the contract. We think it is fair to state that from the record there is nothing which leads us to believe that Petry's conduct was in any way fraudulent or dishonest. The most that can be said of it is that Petry was acting under a mistake of fact. One must also conclude that Greater Huntington thought that its agreement with Petry was one of the assets purchased by Cowles or it certainly would have negotiated a release or taken some steps to relieve itself of its contingent liability thereunder. Had it known when it sold out to Cowles that its agreement with Petry had not been assumed, it would have, of course, been charged with knowledge of that fact and would not now be allowed to rely on Petry's acts and conduct showing a contrary intention. Cf. C.J.S. Estoppel § 71 (1964). Thus, it would seem from the conduct of Greater Huntington and Petry that they were both acting under a mutual mistake of fact, and estoppel cannot be successfully asserted by either. By the same token, waiver, being closely related to estoppel, cannot be asserted where one acts under a misapprehension of the facts. 92 C.J.S. Waiver at pg. 1059 (1955).

Turning now to the fourth defense, Greater Huntington contends that it cannot be held liable under a contract which merely binds it to take its requirements from Petry when it has in fact taken all of its requirements from Petry and, therefore, has not breached the contract. Thus, we must first decide whether the agreement of July 26, 1955, is or is not a "requirements" contract. Paragraph twelve thereof specifically provides that, the agreement being executed in New York, it should be construed under the laws of the State of New York. This being consistent with Erie Railroad Co. v. Tompkins [2] the law of New York will apply. Under New York law, a requirements contract is one whereby the seller agrees to furnish, and the buyer expressly agrees to take from the seller, the buyer's requirements of a certain commodity for use in connection with an established business, or such quantity of a commodity as he may require in the business. Cf. Edison Electric Illuminating Co. of Brooklyn v. Thacher, 229 N.Y. 172, 128 N.E. 124. On that basis we must conclude that the contract involved here is not a requirements contract and it was not self-terminating upon the sale of the station and the subsequent dissolution of Greater Huntington. The contract here did not contemplate a buyer-seller relationship, but rather one of principal and agent. As specifically stated in the second numbered paragraph thereof,

"2. STATION hereby appoints REPRESENTATIVE as the sole and exclusive representative and agent for the sale of STATION'S time * * *."

This clearly cannot be interpreted as a promise *binding* upon Petry to supply Greater Huntington with its advertising requirements or needs. At most, it only required good faith and diligence on Petry's part to sell such national advertising time to its various clients as they were *willing* to buy—nothing more. The clients themselves were the only ones in

---

2. 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

position to buy advertising time, and Petry was nothing more than a "go-between" in channeling them to Greater Huntington. If they were unwilling to buy, Petry was obviously unable to furnish. Consequently, Petry was never in position to guarantee fulfillment of all or any part of Greater Huntington's advertising requirements. Any commitments it might have made in this regard were always circumscribed by, and subject to, the will of its clients.

■■■ For an even broader reason, this contract cannot be construed as a valid requirements contract because it lacks mutuality of obligation. As we have seen, it did not bind Petry to sell a fixed quantity or volume of time, and by the same token, it imposed no obligation whatever upon Greater Huntington to accept any precise quantity or volume of advertising. This is clearly shown by numbered paragraph six thereof,

> "6. REPRESENTATIVE cannot and shall not execute any contract which binds or obligates STATION, without receiving written or telegraphic authority from STATION to do so."

Thus, it is seen that Greater Huntington could only become bound by giving its "written or telegraphic authority" to do so. It was free to give or withhold its authority as it chose, and Petry's power was always subject to this limitation. So where, as here, acceptance of the commodity depends upon the mere wish, desire, whim or fancy of the buyer, the contract is unenforceable for lack of mutuality. Cf. Oscar Schlegel Mfg. Co. v. Peter Cooper's Glue Factory, 231 N.Y. 459, 132 N.E. 148, 24 A.L.R. 1348, 26 A.L.R.2d 1146; Leach v. Kentucky Block Cannel Coal Co., 256 F. 686 (D.C.N.Y.). In this latter case, involving a coal purchase contract, but which failed to obligate the buyer to take a fixed amount, the court held that,

> "(T)he agreement is in principle, in one aspect, within that class of cases which have come to be known

as 'will, wish, or want' contracts. It is an agreement clearly lacking in mutuality."

■■■ The remaining question for consideration is whether or not there has been a breach of the contract. Petry contends that it was breached, in that it was not terminated pursuant to Paragraph 10 thereof; but, as we view it, there has in fact been no cancellation or termination, unless Greater Huntington's abortive attempt to assign it to Cowles could be so construed, a fact we have already found to be insufficient for that purpose. Nor could Cowles effect termination, since it was not a party to the contract and had not legally assumed it. When Greater Huntington sold to Cowles, it paid Petry's account to that time. Petry, thinking that Cowles had stepped into Greater Huntington's shoes, undertook to do business with Cowles, under the contract for some 3½ years. During this period, Petry treated the contract as unbroken and accepted payments from Cowles thereunder. This happy arrangement was only frustrated when Cowles and Petry disagreed and Cowles discontinued Petry's services. Apparently it was then, and only then, that Petry awoke to the possibility of going back on Greater Huntington for breach of contract on the theory that sale of the station effected a wrongful cancellation or termination. We find no evidence in the record tending to show that Greater Huntington at any time—before or after sale of its station to Cowles—took any positive steps to formally terminate or cancel the contract. Absent of a wrongful cancellation or termination, in what way then has it been breached, if at all? Greater Huntington having made Petry its exclusive representative, it was bound to place its advertising needs with Petry and to pay the contract commission thereon, and the evidence shows that Greater Huntington did just this so long as it operated the station and has paid Petry for all advertising time sold; indeed, Cowles, its successor has done likewise. Nor does it appear that after the sale of

the station, Petry ever proffered any advertising to Greater Huntington which it refused.

So, it is seen that Petry has no claim for commissions for advertising time *sold* or *proffered*; its grievance here going only to Greater Huntington's failure to take up where Cowles left off. The fallacy of this contention, however, lies in the fact that the contract did not prohibit the sale of the station. Nor is there evidence that Greater Huntington has since had any *need* for advertisers or that it has since engaged from another services similar to Petry's. Thus, since it has. been shown that Petry at no time had the right to compel Greater Huntington to sell advertising time to Petry's clients, and since the record is clear that Greater Huntington has paid Petry its commission for all advertising it accepted from Petry's clients and has since taken none from others in violation of its duty to Petry under the exclusive agency clause of the contract, there has been no breach of the contract by Greater Huntington insofar as we can perceive, and Petry has suffered no loss of anticipated profits for which it may recover in a court of law.

Accordingly, the contract is technically in force and will continue so until terminated in the manner provided for therein, and, if not so terminated, it might afford the basis for an action by Petry against Greater Huntington in the future if the latter were to reactivate its station in Huntington and engage from another services similar to Petry's in violation of the exclusive agency clause referred to. Yet, until such an eventuality occurs, Petry has no actionable grievance against Greater Huntington under the terms of the contract in question.

This opinion shall be taken as the equivalent of findings of fact and conclusions of law, pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, and an order may be presented, making it a part of the record, and dismissing Petry's action against Greater Huntington.