**JOE POWELL & ASSOCIATES, INC., et al. Plaintiffs,**

v.

**INTERNATIONAL TELEPHONE AND TELEGRAPH CORPORATION, Defendant,**

v.

**NESBITT CORPORATION, formerly Environmental Technologies Corporation, Third-Party Defendant.**

Adv. Nos. 3–81–0446 to 3–81–0449.

United States Bankruptcy Court, E. D. Tennessee.

Aug. 3, 1982.

Wilson S. Ritchie and Ann C. Short, Knoxville, Tenn., for plaintiffs.

John H. Fowler, Fowler & Rowntree, Knoxville, Tenn., Lee L. Piovarcy, Martin, Tate, Morrow & Marston, Memphis, Tenn., Russell G. Tisman, New York City, for defendant Intern. Tel. and Tel. Corp.

CLIVE W. BARE, Bankruptcy Judge.

The matter before the court is the motion of the defendant ITT to dismiss the Amended Complaints of the plaintiffs (R. I. Greene & Associates, Inc., Joe Powell & Associates, Inc., Engineered Machinery Sales, Inc. and James A. Rankin & Associates, Inc.). In ruling on the motion of the defendant ITT, the court is required to accept the allegations of the Amended Complaints as true. *United States v. New Wrinkle*, 342 U.S. 371, 72 S.Ct. 350, 96 L.Ed. 417 (1952).

The original complaints were filed in the U.S. District Court for the Eastern District of Tennessee. Applications for removal to this court were filed on May 22, 1981, and the cases were duly removed pursuant to the provisions of 28 U.S.C.A. § 1478(a) (Supp.1982). The defendant ITT also filed

a third-party complaint against Nesbitt Corporation, formerly known as Environmental Technologies Corporation (ETC), on or about May 22, 1981.

After some discovery and a series of motions, the Amended Complaints were filed on January 14, 1982.[1] In reply thereto, the defendant ITT elected to file Motions to Dismiss, which were filed on February 16, 1982.

According to the allegations of the plaintiffs' Amended Complaints, ITT, through an unincorporated division known as ITT-Nesbitt, was engaged in the manufacture and sale of custom-built air-conditioning, heating, and ventilating equipment during the period between 1963 and July of 1979. Manufacturing sites were located in Philadelphia, Pennsylvania, and Jackson, Tennessee. The administrative offices for ITT-Nesbitt were in Philadelphia until the latter part of 1977 and early 1978, when a portion of the administrative offices were transferred to Jackson, Tennessee. All of the manufacturing of ITT-Nesbitt products occurred in Jackson after early 1978.

The products of ITT-Nesbitt were marketed through a network of approximately 60 manufacturers' sales representatives, each of whom was assigned an exclusive territory in which to solicit orders for ITT-Nesbitt products. These representatives agreed not to sell products which might be deemed to be competitive with the products of ITT-Nesbitt, unless written permission to do so was obtained from ITT. ITT-Nesbitt did not utilize any other type of sales force and there were no middlemen such as distributors, wholesalers, or dealers.

ITT also appointed qualified repair service contractors to perform start-up services, first-year warranty services, and other warranty services. Authorization for the performance of services by the appointed service contractors was to be obtained through the issuance of purchase orders. These service contractors were required to maintain the necessary equipment for testing and to stock certain parts recommended by ITT.

The agreement between ITT and the manufacturers' sales representatives is evidenced by a document entitled "Sales Representative Contract." Each of the plaintiffs is a party to one of the Sales Representative Contracts. The material terms of these agreements provide that:

(1) The sales representative is given an exclusive territory in which to solicit orders.

(2) The sales representative may solicit orders for products which are complementary and noncompetitive with Nesbitt products, but the representative may not solicit orders for products either directly or indirectly competitive with Nesbitt products.

(3) The sales representative has no authority to accept any order on behalf of Nesbitt.

(4) The sales representative agrees to "actively and diligently" promote the sale of the Nesbitt products.

(5) Nesbitt reserved the right to accept or reject any orders solicited by the sales representative.

(6) All payments were to be made directly to Nesbitt. The sales representative was to be compensated by commissions payable for purchase orders accepted in writing by Nesbitt.

(7) The agreement was to be effective until termination by mutual agreement or by either party upon 30 days written notice to the other party.

(8) The agreement could not be assigned or transferred without the prior written consent of ITT.

The plaintiffs allege that they actively and diligently promoted the ITT-Nesbitt products pursuant to the aforesaid sales representative agreements.

The plaintiffs also entered into agreements with ITT to act as qualified repair service contractors with regard to ITT-Nesbitt products. These agreements were also nonassignable by the plaintiffs and could be terminated on the same terms as the Sales Representative Contracts.

1. The amended complaints filed on June 30, 1982, are not under consideration herein.

The plaintiffs further allege that ITT-Nesbitt had been profitable until 1976, but that the division incurred substantial losses in 1976 and that the losses continued thereafter. ITT sent James E. Hall, one of its employees, to Jackson, Tennessee, to be general manager of ITT-Nesbitt and to prepare ITT-Nesbitt either for divestiture or a shutdown and liquidation. ITT began to solicit prospective purchasers for ITT-Nesbitt sometime during 1978. Certain standards were formulated for prospective purchasers due to ITT's awareness of the financial requirements for assuming its liabilities and sustaining the operation of ITT-Nesbitt.

As of May 1, 1979, ITT had not sold the ITT-Nesbitt division, but James E. Hall persuaded the senior management of ITT that a decision to liquidate should be deferred. ITT's analysis of its options indicated that liquidation would result in a much greater financial loss than divestiture.

The plaintiffs allege that ITT knew that James E. Hall was providing false information designed to mislead prospective purchasers of the Nesbitt Division during the period between March of 1979 and July of 1979.

Foster McCarl, Jr. advised ITT that he was interested in forming a corporation for the purpose of acquiring ITT-Nesbitt. A Tennessee corporation known as Environmental Technologies Corporation (ETC) was in fact formed on July 5, 1979, and, on July 9, 1979, ETC purchased the assets of ITT-Nesbitt, including the agreements, contracts, leases, and licenses of ITT-Nesbitt. ITT did not investigate or ascertain the financial capability of ETC to perform the agreements of ITT-Nesbitt or bear the costs of performing warranty work or perform the obligations to be assumed by ETC. ITT either knew or should have known that ETC did not have adequate financial resources to perform the agreements between ITT and ETC. (ETC executed two separate promissory notes in the respective amounts of $1.8 million and $4.4 million and paid $500,000.00 in cash for the purchase of Nesbitt. The cash payment was possible be-cause ITT deeded the Philadelphia property of ITT-Nesbitt to a partnership composed of Foster McCarl, Jr. and Bennard Benson, who were the only subscribers for the shares of the authorized capital stock of ETC. The conveyance enabled the grantees to mortgage the property and obtain the funds necessary for the cash payment.)

It is further alleged by the plaintiffs that the contract between ETC and ITT, at the insistence of ITT, was "consummated under a veil of secrecy and deception." The contract purportedly allowed ETC to use ITT-Nesbitt's forms and other indicia of ownership for a specific period and prohibited any notice of the conveyance to other parties to contracts with ITT without the prior written consent of ITT.

Prior to the sale of Nesbitt to ETC, ITT reduced the assets of ITT-Nesbitt by accelerating the collection of accounts receivable and disposing of assets. After July 9, 1979, ITT acknowledged its misrepresentation of the assets of ITT-Nesbitt to ETC, which resulted from the aforesaid acceleration and disposition of assets, by modifying the terms of the notes given by ETC for the purchase of Nesbitt.

Plaintiffs allege that ITT knew that it had not adequately and properly advised ETC of the financial condition of ITT-Nesbitt and that ITT knowingly and deliberately failed to disclose this financial condition and potential for liability.

It is also alleged that ITT was in control of ETC's Jackson operation subsequent to the July 9, 1979 sale date by virtue of the presence and activities of James E. Hall, former general manager of ITT-Nesbitt, and Frank Raschilla, comptroller of ITT-Nesbitt, since these parties controlled all information and decisions relating to the operations and finances of ETC. Plaintiffs allege that Hall and Raschilla remained on the ITT payroll after the divestiture date. It is also alleged that ETC operated under the name of the Nesbitt Corporation for 10 months after divestiture and that ETC used purchase order forms and other forms previously used by ITT for ITT-Nesbitt transactions.

Plaintiffs allege that ITT deliberately and knowingly sold ITT-Nesbitt to ETC, concomitantly realizing that ETC could not fund the requirements and obligations assumed by ETC because this was the "most advantageous economic decision for ITT, whether or not ETC was successful."

ITT knew that the marketing system which it had established was essential for the continuation of Nesbitt's operations. ITT also knew that the plaintiffs had engaged in substantial presale activity for the purpose of selling ITT-Nesbitt's products.

Plaintiffs were still acting as sales representatives and service contractors for ITT-Nesbitt at the time of the conveyance of Nesbitt by ITT to ETC. Plaintiffs had prepaid equipment orders with ITT-Nesbitt on the date of the sale to ETC which ITT was obligated to fill. Plaintiffs were also obligated to their customers to supply goods ordered from ITT-Nesbitt but not yet manufactured by ITT-Nesbitt.

ITT made no effort to terminate plaintiffs' services as sales representatives or service contractors at the time of the sale to ETC. No effort was made to secure a release or discharge of ITT from its contractual liability to the plaintiffs, and no notice was given to the plaintiffs prior or subsequent to the sale that ITT-Nesbitt would be sold and that ITT would no longer be connected with or responsible for the Nesbitt Division.

ETC, now known as Nesbitt Corporation, filed a Chapter 11 bankruptcy petition on May 13, 1980, in the Western District of Pennsylvania. Plaintiffs were holders of unsecured claims against Nesbitt when this petition was filed. In recognition of its "responsibility and liability to ETC, Foster McCarl, Jr. and the creditors of ETC," ITT entered into an agreement with the Nesbitt Corporation and Foster McCarl, Jr. This agreement provided in part for:

(a) The release by ITT of its security interest against equipment of the debtor so as to create a fund for the purpose of funding an agreement which would in effect extinguish the liability of ITT to creditors who accepted the plan.

(b) ITT, ETC, and Foster McCarl, Jr. would release any claim that any one party might have against either of the other parties.

(c) ITT would satisfy any liability incurred by Foster McCarl, Jr. as a result of his involvement in ETC's purchase of ITT-Nesbitt.

The plaintiffs allege numerous causes of action against ITT. The majority of these causes are related to particular instances, preceding and subsequent to the divestiture sale, in which the plaintiffs allege that ITT has either failed to timely deliver equipment for which orders were accepted or that ITT failed to furnish satisfactory equipment for orders which were accepted. A few of the causes of action concern the plaintiffs' attempt to recover sales commissions which are allegedly due the plaintiffs. Another cause of action is related to the plaintiffs' claim that they are entitled to payment for warranty work performed pursuant to the repair service contracts.

Six causes of action outline the plaintiffs' theories entitling them to relief from the defendant ITT. These are the causes of action which are the quintessence of the Amended Complaints. This memorandum is limited to a consideration of these six causes of action, which may be generally described as follows:

(1) Breach of Contract

(2) Fraudulent Conveyance

(3) Fraudulent Concealment or Breach of a Fiduciary Duty

(4) Conspiracy in Connection with the Chapter 11 Plan of Nesbitt

(5) Conspiracy in Connection with the sale of Nesbitt by ITT to ETC

(6) Estoppel.

 Preliminarily, the court notes that motions to dismiss are ordinarily disfavored, rarely granted and that any doubt is resolved in favor of nondismissal. *Williams v. Gorton,* 529 F.2d 668 (9th Cir. 1976), *aff'd* 566 F.2d 1186 (9th Cir. 1977); *Madison v. Purdy,* 410 F.2d 99 (5th Cir. 1969); *Land-*

*mark Tower Assoc. v. First Nat'l Bank of Chicago,* 439 F.Supp. 195 (S.D.Fla.1977). Also, it is to be remembered that the allegations of the plaintiffs are accepted as true when the court rules on a motion to dismiss.

### (1) *Breach of Contract*

The plaintiffs allege that ITT intended that the Sales Representative Contracts and Repair Service Contract Agreements between ITT and plaintiffs would be part of the conveyance by ITT to ETC and that the rights and duties of ITT thereunder were assigned and delegated to ETC as a result of the conveyance. The plaintiffs state that their assent to either release or discharge ITT from its contractual obligations was never sought by ITT and that ITT is still bound by the contractual obligations with respect to post-divestiture breaches of the contractual duties owed under the Sales Representative Contracts and the Repair Service Contractor Agreements. Plaintiffs further allege that they have performed according to the terms of the two aforementioned contracts and that they have incurred considerable expense in obtaining replacement equipment and correcting defects in equipment actually delivered by Nesbitt.

It is the plaintiffs' position that the "assignment of a bilateral contract includes both an assignment of rights and a delegation of duties." See *Williston on Contracts,* Third Edition Section 418. Consequently, plaintiffs believe that ITT was not relieved of its duties to them by virtue of its divestiture of Nesbitt. Plaintiffs further believe that ITT is therefore liable for any breach of contract committed by ETC, since ITT never terminated its contracts with the plaintiffs or otherwise obtained a release from its obligations thereunder. Plaintiffs cite *Contemporary Mission, Inc. v. Famous Music Corp.,* 557 F.2d 918 (2d Cir. 1977), and *Edward Petry & Co. v. Greater Huntington Radio Corp.,* 245 F.Supp. 963 (S.D.W.Va. 1965), in support of this position.

The defendant ITT takes the position that it has no liability to the plaintiffs for any breach which occurred subsequent to the divestiture on July 9, 1979. ITT argues that it had the right to accept or reject purchase orders prior to the execution of the Sales Representative Contracts and that these contracts did not affect, alter, or create that right. Therefore, the right was not assigned to ETC and no duty arose on ITT's part to pay commissions on any post July 9, 1979 orders accepted by ETC and not by ITT. The defendant ITT also argues that it was under no duty to accept any order, as evidenced by the explicit provisions of the Sales Representative Contract and that ITT had no liability to plaintiffs unless orders were accepted in writing by ITT and that no orders were so accepted by ITT after divestiture.

ITT also asserts that the plaintiffs have failed to cite any term of the sales representative contract which was breached by ITT. Furthermore, ITT states that the plaintiffs dealt with ETC after July 9, 1979, and that plaintiffs must look to ETC for recovery of any damages for defaults occurring subsequent to that date.

The instant case is patently distinguishable on a factual basis from the case of *Edward Petry & Co. v. Greater Huntington Radio Corp.,* 245 F.Supp. 963 (S.D.W.Va. 1965), which involved a representative agreement, between Petry and Greater Huntington, similar to those between the plaintiffs herein and ITT. Greater Huntington sold its assets to Cowles Broadcasting Company approximately one year after the date of its exclusive representative agreement with Petry. Cowles accepted and paid for Petry's services for a period of 3½ years before giving notice to Petry that its services would no longer be required. Petry filed suit against Greater Huntington after receiving the aforementioned notice from Cowles. A jury found that Cowles did not acquire the agreement between Petry and Greater Huntington when Cowles purchased the assets of Greater Huntington. The plaintiffs in the pending cases have alleged that ITT did assign the Sales Representative Contracts to ETC. More importantly, however, Petry was apparently paid for its services, because Petry's grievance

concerned the termination of its services and its rights to commissions from the prospective sale of advertising time. The grievances of the plaintiffs herein relate to orders purportedly accepted by either ITT or ETC for which the plaintiffs allege either that: (1) plaintiffs are entitled to commissions which have not been paid; or (2) defective equipment was delivered to the buyer; or (3) equipment was untimely delivered.

The court does believe, however, that the following language from Judge Christie's opinion in *Petry* is apposite in determining whether or not to grant the motions to dismiss.

> [W]e must first look to the status of the contractual obligations existing between them before Greater Huntington sold out to Cowles. So viewed, there can be no doubt that had the transaction with Cowles not taken place, Greater Huntington's obligation to carry out the contract would have continued. This being so, Greater Huntington could not unilaterally assign and transfer to another its side of the contract and thereby relieve itself of its obligations thereunder.

*Petry*, 245 F.Supp. at 967.

ITT neither terminated the agreements, which it could easily have done, nor was any attempt made by ITT to reach an agreement or novation whereby ITT's contractual obligations would have ceased.

*Contemporary Mission* involved two separate contracts known as the "VIRGIN agreement" and the "Crunch agreement." Under the terms of the former agreement, Famous Music Corp. was obligated to pay royalties to Contemporary in exchange for the master tape recording of VIRGIN, a rock opera, and the exclusive right to manufacture and sell recordings of VIRGIN. The so-called VIRGIN agreement contained a nonassignability provision in favor of plaintiff Contemporary which was breached by the defendant Famous Music Corp. when Famous' record division was sold to ABC Records, Inc. The contracts between the plaintiffs herein and ITT also contain a nonassignability term, but that term is op-erative in favor of ITT. However, the Crunch agreement, a distribution contract between Contemporary and Famous Music Corp. dealing with compositions other than VIRGIN, included a nonassignability provision in favor of the defendant Famous Music Corp. ABC Records, Inc. failed to perform Famous' obligations under the Crunch agreement after it purchased Famous' record division. The Second Circuit Court of Appeals affirmed a jury verdict that Famous was liable for the breach of both agreements. The court of appeals noted that the following jury charge of the trial court was correct: "[A]fter the assignment of the contract (Crunch agreement) by Famous to ABC, Famous remained liable for any obligation that was not fulfilled by ABC." *Contemporary Mission* at 924.

■ The court is not prepared to conclude that ITT, as a matter of law, had no contractual duty to the plaintiffs subsequent to the divestiture sale of Nesbitt.

### (2) *Fraudulent Conveyance*

Plaintiffs contend that they were creditors of ITT on the date of the conveyance of Nesbitt by ITT to ETC and that the conveyance "was made with the actual intent by ITT to hinder, delay or defraud ITT's creditors." Plaintiffs further contend that ITT knew or should have known that ETC did not have either the financial resources or the financial ability to assume ITT-Nesbitt's obligations. Plaintiffs also contend that they were injured and prejudiced by the fact that ETC was "unable to fulfill the contractual obligations and unable to pay the debts incurred by ITT as a result of ITT's ownership and management" of ITT-Nesbitt. Plaintiffs believe that the July 9, 1979, conveyance by ITT to ETC is voidable pursuant to T.C.A. § 66–3–308 (former T.C.A. § 64–315) and that T.C.A. § 66–3–313 (Application of general law) is also apposite.

The defendant ITT insists that the plaintiffs are not creditors of ITT with respect to post-divestiture transactions and that the statute does not create a cause of action. ITT believes that the plaintiffs must estab-

lish a cause of action independent of the Fraudulent Conveyance Act. ITT also contends that the plaintiffs were not prejudiced by the sale of Nesbitt to ETC. *See, United States v. Kerr*, 470 F.Supp. 278 (E.D.Tenn.1978). (The defendant ITT cites *Kerr* to support the proposition that the conveyance should not be set aside since ITT has retained assets more than sufficient to satisfy the plaintiffs' demands.)

■ Accepting the allegations of the Amended Complaints as true, the plaintiffs were creditors of ITT on the date of the divestiture sale. The plaintiffs allege expressly that the sale of ITT-Nesbitt to ETC was transacted by ITT with the actual intent to hinder, delay, or defraud ITT's creditors, including plaintiffs. Since the plaintiffs were creditors on the date of the divestiture sale, they are entitled to maintain their cause of action against ITT on the basis of the alleged fraudulent conveyance.

### (3) Fraudulent Concealment

The plaintiffs allege that, considering all of the circumstances, particularly the business relationship between them and ITT and ITT's superior knowledge of the facts, there was a duty on the part of ITT to disclose the proposed sale of Nesbitt. Plaintiffs cite *Melchiorre v. California Canners & Growers*, 394 F.2d 413 (4th Cir. 1968), and *Smyth Sales v. Petroleum Heat & Power Co.*, 128 F.2d 697 (3d Cir. 1942), in support of this contention.

The plaintiffs also allege that ITT "falsely and fraudulently concealed" the intention to sell Nesbitt to ETC from the plaintiffs and that ETC was assuming all of ITT's obligations connected with ITT-Nesbitt. The plaintiffs state that they would not have continued to do business and engaged in the presale activity which they did if they had known of ITT's plan to sell Nesbitt to ETC. Plaintiffs admit that they eventually learned of the conveyance, but they insist that they continued to do business with ETC because of their contractual commitments to other parties. The plaintiffs also note that they were not in a position to ascertain the financial condition of ETC.

ITT argues that the plaintiffs are sophisticated businessmen and that there was no fiduciary duty owed to them by ITT. ITT has also argued that there was no duty to disclose to plaintiffs their intention to sell Nesbitt because to have done so may have been a violation of § 10(b)(5) of the Securities and Exchange Act. Furthermore, ITT asserts that the plaintiffs had actual and constructive notice of the sale. This assertion is disputed, but the court must accept the allegations of the plaintiff as true in ruling on a motion to dismiss.

■ The court believes that the plaintiffs are entitled to present evidence concerning the overall business relationship between the plaintiffs and ITT and the facts related to divestiture to determine whether or not there was a duty of an equitable or good faith nature on the part of ITT apart from the written agreements and whether or not there was a fraudulent concealment of the facts by ITT. A "design of dealing" between the parties to an agreement may require a reasonable fair advance notice of an intention to terminate an agreement. *Melchiorre, supra.*

### (4) Conspiracy in Connection with the Chapter 11 Plan of Nesbitt

The plaintiffs allege that ITT conspired with either some or all of the Nesbitt shareholders and with Nesbitt to formulate a Chapter 11 plan funded by ITT whereby ITT would, in effect, buy its liability to creditors. The plaintiffs also allege that ITT, Nesbitt, and Foster McCarl, Jr. have executed mutual releases in furtherance of the conspiracy and that ITT agreed to hold McCarl harmless from any personal liability on his part related to the debts of Nesbitt. The plaintiffs contend that as a result of the plan and the mutual releases they are unable to collect the full amount owed to them.

ITT insists that the matter is res judicata because the plaintiffs participated in the Nesbitt bankruptcy. Furthermore, ITT notes that the plaintiffs have not sought

revocation of the confirmed Chapter 11 plan within the 180-day limitation period prescribed in 11 U.S.C.A. § 1144. ITT also argues that the provisions of the confirmed plan are binding in this case, by virtue of the provisions of 11 U.S.C.A. § 1141(a) and that any attack upon the plan as confirmed by the Pennsylvania bankruptcy court must be brought in that court. Finally, ITT insists that plaintiffs should be barred by the doctrine of laches since ITT has given up its security status in order to fund the plan and compromise claims and has given up rights which it could never regain.

The plaintiffs argue that they may be prohibited from pursuing relief from Nesbitt by virtue of the confirmed plan but that ITT was not the debtor in the Chapter 11 proceeding and that they are not prohibited from pursuing the conspiracy claim against ITT in a forum other than the court which confirmed the Chapter 11 plan.

■■ The court is also not prepared to disallow the cause of action which the parties have described as a collateral attack on the Chapter 11 Nesbitt bankruptcy proceeding. The plaintiffs are seeking recovery from ITT, not from Nesbitt. Also, although a challenge to the confirmation of a Chapter 11 plan on the basis of fraud should ordinarily follow the procedures outlined in the bankruptcy laws, those laws do not provide an exclusive remedy. *Bizzell v. Hemingway*, 548 F.2d 505 (4th Cir. 1977).

### (5) *Conspiracy in Connection with the Sale of Nesbitt by ITT to ETC*

Plaintiffs allege that ITT conspired with some or all of the principal stockholders of ETC for ITT to convey Nesbitt to ETC, which had been formed for the purpose of acquiring Nesbitt and absorbing current and future losses of ITT-Nesbitt. Plaintiffs further allege that ITT knew the importance of the marketing system which ITT had established for ITT-Nesbitt and that it was essential that the marketing system be perpetuated. Plaintiffs also allege that ETC used purchase order forms and other forms previously used by ITT subsequent to divestiture thereby misrepresenting to plaintiffs that ITT still owned Nesbitt. It is plaintiffs' assertion that ITT acted with the intent that plaintiffs would be induced to continue solicitation of orders so that ITT might profit by having ETC absorb certain losses of ITT-Nesbitt.

ITT insists that plaintiffs have no cause of action for conspiracy because they failed to allege the elements of a conspiracy and because they had actual and constructive knowledge of the sale to ETC. Thus, they could not have been misled by the continued use of the forms by ETC which ITT-Nesbitt had previously used. ITT also takes the position that the plaintiffs have not sustained any actual damage as a result of the alleged conspiracy.

■ The plaintiffs will be allowed to pursue their cause of action for the alleged conspiracy in connection with the sale of Nesbitt to ETC. The plaintiffs make very serious allegations regarding agreements between ITT and unnamed shareholders of ETC. If these allegations are deemed to be true, plaintiff is entitled to pursue this cause of action.

### (6) *Estoppel*

The plaintiffs assert that they were initially induced to enter into the sales representative contracts and the repair service contracts, in part, due to the "general business reputation and financial status" of ITT. Plaintiffs allege that, by virtue of their business relationship with the defendant and the duration thereof, plaintiffs had confidence in the financial stability of ITT and that plaintiffs completely relied upon ITT for information relative to ITT-Nesbitt that might affect their services as sales representatives and repair service contractors. Plaintiffs reiterate their belief that this business relationship created a duty on the part of ITT to notify the plaintiffs of the proposed sale of Nesbitt.

Plaintiffs further allege that: (1) ITT knew that plaintiffs were engaged in presale activities and that without advance notice that plaintiffs would be forced to do business with the successor of ITT-Nesbitt;

(2) plaintiffs had no knowledge of the proposed sale to ETC; (3) plaintiffs would not have continued soliciting orders either prior to or after July 9, 1979, if they had known of the sale of Nesbitt to ETC.

The plaintiffs restate their allegations regarding the concealment of the sale of Nesbitt to ETC based on the continued use by ETC of forms which had previously been used by ITT-Nesbitt. Plaintiffs also restate their allegations that they were contractually obligated to third parties to supply products manufactured by Nesbitt when they learned of the sale to ETC and that they were compelled to deal with ETC.

ITT argues that estoppel cannot be employed to create a cause of action and that the plaintiffs have admitted the correctness of that legal principle in their brief. ITT also notes that the contracts between the plaintiffs and ITT did not require ITT to inform the plaintiffs of the proposed sale of Nesbitt. ITT asserts that, in fact, plaintiffs should be estopped since they had knowledge of the sale shortly after July 9, 1979, if not before, and of the bankruptcy proceeding.

The plaintiffs will not be allowed to pursue a cause of action based on their estoppel argument. The plaintiffs themselves have acknowledged in their own brief that "estoppel cannot be used to create a right." Brief for the Plaintiffs in Opposition to the Motion to Dismiss of Defendant International Telephone and Telegraph Corporation at 52.

The cause of action based on estoppel is dismissed but plaintiffs may proceed on the remaining causes of action.

IT IS SO ORDERED.